ISHEE, J.,
for the Court:
¶ 1. In 2005, Tamika Foster was treated at the University of Mississippi Medical Center (UMMC) on several occasions for various abnormal symptoms she was experiencing during her pregnancy. On August 18, 2005, Foster was diagnosed with Class I hemolysis, elevated liver enzyme levels, and low-platelet-count syndrome (HELLP). Thereafter, Foster gave birth at UMMC and later admitted to the intensive care unit (ICU) with continuing symptoms of pain, nausea, and vomiting. On August 20, 2005, Foster went into respiratory arrest and died. An autopsy was performed several days after Foster passed away. The autopsy included a test for thrombotic thrombocytopenia purpura (TTP). On November 30, 2005, the autopsy report was finalized; the report stated the cause of death was myocardial ische-mia with arrhythmia secondary to TTP. However, Foster’s death certificate stated *157 that she died of HELLP. Foster’s parents later filed suit in the Hinds County Circuit Court against UMMC on behalf of Foster’s minor child, Malik R. Caldwell, claiming UMMC was negligent in failing to diagnose and treat Foster for TTP and that the negligence was a proximate contributing cause of Foster’s wrongful death. During the bench trial on the matter, the circuit court focused heavily on the autopsy report. UMMC objected to the circuit court’s use of the autopsy report in its analysis because the circuit court refused to allow UMMC to present expert testimony regarding the content of the autopsy report and statistical evidence showing TTP tests using postmortem blood are unreliable. Despite UMMC’s protests, the circuit court concluded that based on the autopsy report, UMMC had breached the standard of care by negligently failing to diagnose and treat Foster for TTP and that the TTP was a contributing cause of Foster’s wrongful death. The circuit court then entered a judgment against UMMC in the amount of $500,000. Aggrieved, UMMC appeals, claiming the circuit court erred in its reliance upon an invalid test when concluding that UMMC was negligent and that the court erred when it refused to allow UMMC’s expert and treating physician to testify as to the content of the autopsy report. We agree; accordingly, we reverse the judgment of the circuit court and render.
STATEMENT OF FACTS
¶ 2. On January 25, 2005, Foster arrived in the UMMC obstetrics department (OB) complaining of blurred vision and a headache. After an evaluation, she was prescribed medication and sent home. Five days later, Foster returned to the OB with high blood pressure. She was diagnosed with gestational diabetes and was, therefore, deemed to have a high-risk pregnancy. On August 8, 2005, Foster reported to the OB High Risk Clinic for her initial visit. Four days later, she arrived at the OB complaining again of blurred vision as well as numbness in her fingertips and toes. Finally, on August 18, 2005, she returned to the OB with complaints of nausea, burning in the upper abdomen, vomiting, epigastric pain, intermittent headaches, and some urinary urgency. She was diagnosed with HELLP, which is a serious disease in pregnant women. HELLP and TTP are two separate causes of thrombocytopenia, which is a decrease in the number of platelets in the blood. Foster was taken to labor and delivery, where her baby boy was delivered via a cesarean section.
¶ 3. The following day, the record indicates Foster’s condition improved. She was restful through the night; her pain, nausea, and vomiting ceased. However, on August 20, 2005, her condition worsened, and she went into respiratory arrest. She died at approximately 4:00 a.m.
¶ 4. On August 23, 2005, an autopsy was performed. The autopsy included an ADAMTS13 test, which determines the existence of TTP. Generally speaking, pertinent TTP symptoms include microan-giopathic hemolytic anemia; neurological abnormalities including confusion, headache, paresis, visual hallucinations, and seizures; fever; and renal dysfunction. On November 30, 2005, the autopsy report was signed and released. Therein, the autopsy stated the cause of death was myocardial ischemia with arrhythmia secondary to TTP. In sum, Foster was stated to have had TTP and to have died from arrhythmia, an abnormal heart rhythm, caused by TTP. However, Foster’s death certificate stated that she died of HELLP.
¶ 5. Foster’s parents filed suit in circuit court against UMMC on behalf of Malik. Foster’s parents asserted that UMMC was *158 negligent in failing to diagnose and treat Foster for TTP, which contributorily caused her death. Specifically, Foster’s parents argued that had UMMC delivered Foster’s baby earlier than August 18, 2005, the progression of TTP would have been less severe and more manageable. A bench trial on the matter was held on June 8, 2009, in the circuit court.
¶ 6. At trial, UMMC’s theory of the case was that Foster did not have TTP, but had HELLP, and that UMMC adhered to the proper standard of care required for treating pregnant women in their third trimester who suffer from HELLP. UMMC further argued that delivering Foster’s baby earlier would have endangered the child, and even if the baby had been delivered earlier, Foster would have suffered from HELLP nonetheless.
¶ 7. In support of its theory, UMMC presented Dr. Baha Sibai as its expert witness. Dr. Sibai was tendered as an expert in obstetrics and gynecology, and Dr. Sibai explained his extensive knowledge of HELLP and TTP. At trial, Dr. Sibai attempted to testify regarding the ADAMTS13 test for TTP and the invalidity of the test’s results when using postmortem blood. Foster’s parents’ counsel objected to Dr. Sibai testifying regarding the finding of TTP in the autopsy report because it was allegedly outside his area of expertise. Counsel for Foster’s parents asserted that only a pathologist could testify as to the ADAMTS13 test. The circuit court sustained Foster’s parents’ counsel’s objection over UMMC’s protests.
¶ 8. Instead, Dr. Sibai was limited to an explanation as to why he believed Foster had HELLP and not TTP. He was also briefly allowed to opine as to how UMMC met the proper standard of care in its treatment of Foster. He further testified regarding his use of the ADAMTS13 test on living patients using live blood and what he looks for in the patients and in the test results. Even though Dr. Sibai outlined his ample knowledge of HELLP, TTP, and the ADAMTS13 test, he was not allowed to testify as to his experience with the ADAMTS13 test using postmortem blood and why the use of postmortem blood corrupts the results.
¶ 9. Next, UMMC presented witness testimony from Foster’s treating physician, Dr. James Martin. Foster’s parents’ counsel objected to Dr. Martin being tendered as an expert in obstetrics and requested that Dr. Martin be limited as simply a treating physician. The circuit court sustained the objection and refused to allow Dr. Martin to testify as to his opinion regarding the ADAMTS13 test results for TTP. Dr. Martin was only allowed to testify about the autopsy report’s findings, but not as to his opinion as to whether or not the findings were accurate for TTP. Dr. Martin offered his opinion as to why he believed Foster had HELLP, but he was not allowed to challenge the autopsy report’s finding of TTP via the ADAMTS13 test using postmortem blood.
¶ 10. At the conclusion of the three-day bench trial, the circuit judge ruled against UMMC in the amount of $1,230,965, which was reduced to the statutory limit of $500,000. The circuit judge then issued a ten-page order and opinion. Therein, the circuit judge opined that: Foster had TTP; the TTP contributed to her death; and UMMC failed to diagnose and treat the TTP properly, thereby breaching the proper standard of care. However, the circuit judge’s opinion was grounded in the ADAMTS13 test results for TTP found in the autopsy report. No other scientific evidence was presented at trial indicating that Foster had TTP, and the circuit judge did not discuss any supporting evidence that Foster had TTP other than the disputed ADAMTS13 test results.
*159 ¶ 11. As such, UMMC appeals, claiming that the circuit court erred in its reliance upon the ADAMTS13 test results, which concluded Foster died of TTP, and that the circuit court erred when it refused to allow UMMC’s expert and treating physician to testify as to their opinions of the contents of the autopsy report. Finding error, we reverse the circuit court’s judgment and render a judgment in favor of UMMC.
DISCUSSION
¶ 12. “This court affords a circuit court judge sitting without a jury the same deference as a chancellor.” Young v. Univ. of Miss. Med. Ctr., 914 So.2d 1272, 1275 (¶ 10) (Miss.Ct.App.2005) (citing City of Jackson v. Perry, 764 So.2d 373, 376 (¶ 9) (Miss.2000)). As such, “after reviewing the entire record, we will affirm if the judge’s findings of fact are supported by substantial, credible evidence and are not manifestly wrong or clearly erroneous.” Id. However, issues of law are reviewed de novo. Id.
I. Circuit Court’s Reliance on the Autopsy Report
¶ 13. The circuit court held that UMMC had breached the proper standard of care by failing to diagnose Foster with TTP when she arrived at UMMC for treatment on August 12, 2005, and on August 18, 2005. After a thorough review of the record and the circuit judge’s written memorandum and opinion, it is clear the judge primarily based her ruling on Foster’s autopsy report. The circuit court’s order states in pertinent part:
Tamika Foster’s autopsy report by Defendant UMMC’s own pathologists concluded that the cause of death was myocardial ischemia with arrhythmia, secondary to thrombotic thrombocy-topenia purpura (TTP) with a history of HELLP. TTP was never diagnosed prior to Tamika’s death.... This Court finds the autopsy report of Defendant UMMC’s pathologists’ [sic] to be credible and reliable. Despite Defendant’s challenge of the methods and tests used by the UMMC pathologists, the pathologist [sic] have stood firm regarding their objective finding of TTP as the cause of Tamika’s death rather than HELLP. Thus, the autopsy findings lean heavily in favor of Plaintiffs [sic] claim that Defendant UMMC’s physicians failed to timely diagnose TTP and that said failure proximately cause [sic] Tameka’s [sic] untimely death_ Tamika’s medical records attest to Defendant UMMC’s failure to aggressively monitor and treat what they mistaking [sic] believed was HELLP.
¶ 14. The autopsy report is the only physical evidence asserting that Foster died of TTP. Her diagnosis at the hospital and the cause of death listed on her death certificate both reflect that Foster contracted and died of HELLP. Foster’s parents do not contend UMMC breached the applicable standard of care for its treatment of Foster with HELLP. They do not address UMMC’s care of Foster as related to HELLP. Rather, they argue Foster died of TTP and her death was the result of UMMC misdiagnosing Foster with HELLP and failing to diagnose or treat Foster for TTP. As such, the pivotal question of the case was whether or not Foster had TTP. If Foster did not have TTP, but instead had HELLP, then UMMC would not have been charged with breaching the standard of care in treating Foster. Accordingly, the circuit court’s analysis in determining whether or not Foster had TTP is paramount to our review.
¶ 15. As discussed later, the circuit court refused to allow UMMC to provide *160 expert testimony as to why the conditions listed in the autopsy report regarding TTP were unreliable. With regard to the validity of the autopsy report’s finding of TTP, the circuit judge only credited testimony from hematologists. However, the two hematologists that testified either specifically stated that using postmortem blood in the ADAMTS13 test makes the results unreliable or stated they were unaware at the time the test was conducted of the studies showing that postmortem blood corrupted the test results.
¶ 16. UMMC’s hematologist, Dr. Joel Lawrence Moake, stated the doctors at his pathology lab “don’t accept postmortem samples because they’re not reliable.” He went on to state: “I’ve run a lab for twenty years[,] and we don’t accept [postmortem blood] samples.” While Foster’s parents’ hematologist, Dr. Charles Greenberg, did link Foster to TTP, he only did so through the autopsy report. Dr. Green-berg testified that as of August 18, 2005, the lab results would have given either a diagnosis of HELLP or TTP, but would not have distinguished between the two diagnoses:
Q: So you agree that as of August 18th, HELLP and TTP are the differential diagnosis [sic]?
A: Yes sir, in the differential, yes.
He further admitted his opinion, that Foster died of TTP, was based upon the autopsy report results:
Q: Your opinion that she died of TTP as you just said was based on the lab test deficiency in ADAMTS13; is that correct?
A: Both a deficiency in the activity and the presence of an inhibitory antibody activity.
¶ 17. Indeed, after reviewing the expert testimony presented at trial and in depositions, we cannot find any testimony directly linking Foster to having had TTP. Dr. Sibai and Dr. Martin both testified that Foster had HELLP and that she was properly treated for HELLP. Foster’s parents’ expert in obstetrics and gynecology could not expressly state that Foster had TTP. He could only state the following:
A: I think that the main point on August 12th was that she had symptoms. She had neurological symptoms. She had an unexplained low platelet count. The diagnosis was not clear at this point. I’m not going to say it was HELLP syndrome. We can’t say it was TTP, TTP. It was uncertain.
Q: You don’t disagree with the diagnosis of HELLP on August the 18th, '05 when she presented, do you?
A: No, I don’t.
A: The final autopsy report revealed TTP, thrombotic thrombocytopenic purpura.
(Emphasis added).
¶ 18. Here, there was no expert testimony which supported to a reasonable degree of medical certainty the notion that Foster had TTP. Only the autopsy report concretely linked Foster with having had TTP. The Mississippi Supreme Court has stated: “A conclusion for which there was no underlying medical support was not vindicated by the use of general methodology in the medical field.” Miss. Transp. Comm’n v. McLemore, 863 So.2d 31, 38 (¶ 19) (Miss.2003) (citation omitted).
¶ 19. We can find no evidence in the record, other than the autopsy report, to support a determination that Foster had TTP and that she died because UMMC failed to treat her properly for TTP. Furthermore, the conclusions of the autopsy report stating Foster died of TTP are questionable, at best. Because we have concluded that there was insufficient evi *161 dence to support a finding that Foster had TTP and died of TTP, we cannot find that UMMC was negligent. As such, we find reversible error in the circuit court’s reliance on the autopsy report.
II. Refusal to Allow UMMC’s Expert Witnesses to Testify
¶ 20. The circuit judge acknowledged that UMMC challenged the methods and tests used in the autopsy report. However, the circuit judge could not have understood the full extent of UMMC’s concerns because she refused to allow UMMC’s expert and treating physician to testify regarding their opposition to the use of postmortem blood in ADAMTS13 tests. As noted above, the circuit court made substantial reference throughout its ten-page opinion to the autopsy report’s finding of TTP, but the court never addressed UMMC’s objections regarding the validity of the test. The circuit court only stated that the experts UMMC presented for testimony were not qualified to comment on the ADAMTS13 test because they were not pathologists. However, both Dr. Sibai and Dr. Martin testified regarding their extensive knowledge of TTP and HELLP as well as the applicable tests for HELLP and TTP.
¶ 21. Mississippi Rule of Evidence 702 governs testimony by experts, stating:
If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.
The Mississippi Supreme Court has also stated, “a witness need not be a specialist in any particular profession to testify as an expert.” Univ. of Miss. Med. Ctr. v. Pounders, 970 So.2d 141, 146 (¶ 17) (Miss.2007) (citation omitted). Rather, “[t]he scope of the [expert] witness’s knowledge and experience, and not any artificial classification, governs the question of admissibility.” Id.
¶ 22. Here, it is obvious that both Dr. Sibai and Dr. Martin were well versed in the areas of HELLP and TTP. Both doctors testified that they had studied, researched, published, and treated both conditions for decades, during which time they had become expertly knowledgeable with the ADAMTS13 test since the use of the test indicated the presence of TTP.
¶ 23. Dr. Sibai explained his extensive knowledge in the field of HELLP, including his role as a professor in obstetrics and maternal fetal medicine and the hundreds of articles, papers, and studies he had completed on the characteristics of HELLP, how to test for the syndrome, and how to treat the syndrome. Dr. Martin outlined his then-twenty-eight year employment with UMMC, including his twenty-year role as the Chief of Maternal Medicine and Obstetrics. Dr. Martin then discussed his extensive study of HELLP and TTP during his career and his ten to fifteen-year work with the Director of Hematology at UMMC researching and treating conditions that are associated with HELLP and TTP.
¶ 24. The doctors should not have been prevented from testifying about specific conditions described in the autopsy report because of their extensive experiences and observations of patients with HELLP and TTP. We find the circuit court’s refusal to allow UMMC’s experts to testify regarding the autopsy report’s finding of TTP to be reversible error.
*162 ¶ 25. THE JUDGMENT OF THE HINDS COUNTY CIRCUIT COURT IS REVERSED AND RENDERED. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEES.
GRIFFIS, P.J., BARNES, ROBERTS, CARLTON AND MAXWELL, JJ., CONCUR. RUSSELL, J., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY IRVING, P.J. LEE, C.J., AND MYERS, J., NOT PARTICIPATING.